# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 23, 2014 Session

## STATE OF TENNESSEE v. SANTOS MEDARDO FUNES ROMERO

**Direct Appeal from the Criminal Court for Knox County**
**No. 96458      Mary Beth Leibowitz, Judge**

_____

**No. E2013-02137-CCA-R3-CD - Filed December 12, 2014**

_____

A Knox County jury convicted the Defendant, Santos Medardo Funes Romero, of rape of a child and aggravated sexual battery, and the trial court sentenced him to an effective sentence of twenty-five years. On appeal, the Defendant contends that: (1) the trial court erred when it did not grant a mistrial or dismiss the jury after several members of the venire discussed having been victims of child sexual abuse; (2) the trial court erred when it denied defense counsel the opportunity to question the investigator about her comments about the weakness of the case; and (3) the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable authorities, we reverse the trial court's judgments, and we remand the case for a new trial or other proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and TIMOTHY L. EASTER, SP. J., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Santos Medardo Funes Romero.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Senior Counsel; Randall E. Nichols, District Attorney General; Kyle Hixson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from allegations of sexual abuse made by an eight-year-old against the Defendant. As a result of these allegations, the Defendant was indicted on charges of rape of a child and aggravated sexual battery.

## A. Voir Dire

During voir dire, the prosecutor asked, "[I]s there anyone who feels that . . . they would be unable to sit in judgment of another human being?" To this, several prospective jurors raised their hands, and the prosecutor inquired further.

MS. SHAFER: I have a daughter that was abused and I can't -- I could listen to the case but it would be very difficult for me.

[Prosecutor]: A little too close to home for you?

MS. SHAFER: Emotional.

[Prosecutor]: And I understand as to the emotional. Do you feel that there is any way that you could put those thoughts aside as this case goes along?

MS. SHAFER: I -- as a Christian, I would certainly do my best, but it would be very difficult.

[Prosecutor]: Okay. And that's understandable. Thank you for disclosing that. I know that's difficult. . . .

I saw another hand. Sir, is it Mr. Clabough?

MR. CLABOUGH: Yes, sir.

[Prosecutor]: And you feel you would be uncomfortable sitting in judgment as well?

MR. CLABOUGH: Yeah, because of the nature of the case. I've got an eight-year old daughter and where we live, several houses close to us there's things close to this that went on, and I don't know if I would be biased or not [.]

[Prosecutor]: Right.

MR. CLABOUGH: -- in all honesty.

[Prosecutor]: Well -- and this is your family that was involved [.]

MR. CLABOUGH: No.

[PROSECUTOR]: -- in this other incident? Can you tell us a little bit about what happened there? What was going on at this other house?

MR. CLABOUGH: It was -- he was a convicted child molester, was not registered and had 10, 15 girls at a time in his basement teaching gymnastics with no other adult supervision, and he was finally picked up at Powell High School patrolling for freshman -- young girls.

[Prosecutor]: And so, he was arrested?

2

MR. CLABOUGH: Yes.

[Prosecutor]: Was he brought to trial, do you know?

MR. CLABOUGH: As far as I know, not yet.

[Prosecutor]: Okay. So to your understanding, he's still in custody awaiting trial?

MR. CLABOUGH: He better be.

[Prosecutor]: And you know, understand all cases are different.

MR. CLABOUGH: No, I understand, but you asked me. I wanted -- . . . I want to be honest.

[Prosecutor]: Right.

MR. CLABOUGH: I don't know that I could be unbiased in this case, you know, this particular case.

. . . .

THE COURT: . . . Is there anybody else that -- there's a gentleman back there.

MR. STRUNK: I was abused as a child.

[Prosecutor]: Okay. Sorry to hear that, sir.

THE COURT: Thank you, sir, for telling us that.

[Prosecutor]: Thank you very much. Obviously, this type of case would be too difficult for you? Thank you.

The Defendant's attorney moved to strike for cause the prospective jurors who had indicated that they had been abused or their child had been abused. The trial court ruled that it would allow the State to attempt to rehabilitate some of the prospective jurors. The State informed the jurors of the difficulties of trying this type of case and the importance of having jurors who care about children serve on the jury. The State then asked:

And with that in mind, Ms. Shafer, let me ask you. I know you said it would be difficult for you to be fair in this case, but do you think that you could listen to both cases and that if the judge instructed you to, that you could render a fair decision in this case?

Ms. Shafer responded that she would "pray that [she] could, yes. I mean, it's a very sensitive subject, but I believe in fairness . . . I couldn't pre-judge because that's not the American way, you know?" Mr. Clabough expressed his belief that he would not be able to acquit the Defendant, even if the State did not prove its case.

The State then turned to question the jury venire about whether a child victim's delay in disclosing abuse would "cloud her testimony" in their eyes.

3

Ms. Watkins replied:

> I was sexually abused by a neighbor two doors down, and I have never
> revealed it to anybody to this day. I never told my parents, I've never told my
> husband, I've never told anybody until this day.
>> [Prosecutor]: And how old are you now?
>> MS. WATKINS: I'm 62.
>> [Prosecutor]: How old were you when this happened?
>> MS. WATKINS:15.
>> [Prosecutor]: And where did you live?
>> MS. WATKINS: In Montreal.
>> [Prosecutor]: Montreal, Canada?
>> MS. WATKINS: Uh-huh (yes). I've never – I've never admitted it to
>> this day.
>> THE COURT: Thank you, Ms. Watkins.
>> [Prosecutor]: And I've noticed you've been emotional through part of
>> this jury selection process, and we understand that, I thank you for sharing that.
>> Ma'am, do you think you would be able to hear this case?
>> MS. WATKINS: I'd try.
>> [Prosecutor]: Are you saying – and I know this is difficult, but do you
>> think that you could put your experience aside as it relates to that and listen to
>> the evidence in this case and if I failed to prove my case beyond a reasonable
>> doubt, could you still acquit the [D]efendant and find him not guilty?
>> MS. WATKINS: I'd try.
>> [Prosecutor]: You'd try to do that. Thank you. Thank you for sharing
>> that. I'm very sorry.

The trial court struck for cause, Mr. Clabough, Ms. Watkins, Ms. Shafer, and Mr.
Strunk. The trial court offered no instructions with regard to Ms. Watkins's statements about
her failing to disclose her abuse for many years. The jury was empaneled, and the
Defendant's counsel moved for a mistrial. He argued:

> [T]his voir dire process was the worst I think I've ever seen. Here we
> are in a child sex case and the first thing we got is a man back here who has
> been abused, a woman whose daughter had been abused, a fellow who . . .
> couldn't acquit even if the State admitted they couldn't prove the case, and
> then the top part . . . the State's asking about what happens if you don't report
> on time and a woman says, I was abused when I was 15, I'm 62 and I didn't
> report it till [sic] today. And . . . I know that I heard at least three people
> saying bless you when that happened. I can't imagine how you have a group

4

of people more tainted for a case like this than to have all that emotional baggage thrown on them during the voir dire process. We haven't even put the first witness on the stand. . . .

I just don't know how at this point [the Defendant] can have confidence that he's got a jury that is untainted by bias caused by other statements of other jurors. And the Court may recall when . . . Ms. Shafer said, . . . she didn't think she could be fair because her daughter had been abused, and we approached and I said, and the other fellow who said he had been abused, and I said, why don't we cut them out of here now so that they don't have to go through all this questioning, and we decided to leave them in . . .

THE COURT: I think the State wanted to see if they could rehabilitate them.

[Defense Counsel]: Right. And what it did was everything went downhill from there. There was the good part. And I just think now I have . . . this jury having been subjected to that and now having bonded with another member of the jury who is no longer sitting in the seat but was certainly there with them and goes through this horrendous first report [45] some odd years later in their presence . . . is unduly prejudicial to [the Defendant] at this point. . . . I can't imagine how anybody could have planted that question or have a better response to an inane question than that one. I'm not saying that the State did anything wrong. I'm saying I think, given the questions that have been asked, the responses that have been had, and what we're left with of this jury is a jury that's too tainted to . . . hear this case on this day.

The trial court ruled:

Okay. There were four people who indicated that they had either been personally abused, knew a child that had been abused or . . . whose child had been abused. It is not uncommon on a jury panel to have people who have been victims of crime or whatever and they can't sit fairly. For instance, an example is when you have a murder and somebody says, my brother was murdered or my cousin was murdered, or my neighbor down the street was murdered. Because they have heard those things does not make the rest of the panel tainted. They are – jurors are not stupid. They are citizens, they know the world around them generally. They have been thoroughly examined by each of you. Even the lady who handed the tissue to the one that had revealed that she had been abused is no longer on the panel, so I think we have a

5

reasonable panel of reasonable people who understand, as [Defense Counsel] carefully and well explained, that each person has rights . . .that they each said they could give a fair trial and if they find that [the Defendant] is not shown beyond a reasonable doubt that he is guilty of the offense charged that they will not convict him.

So I understand the reasons for your motion, but I'm gonna deny that motion at this point, and let's go forward with the trial if you're ready.

## B. Trial

The victim, C.C.,[1] testified through an interpreter that she was ten years old at the time of trial and in the fifth grade. She said that she resided with her mother, father and brother. The victim testified about events that occurred when she was eight years old. She said that she did not recall whether her mother worked outside of the home at this time. C.C. agreed that her mother used to work at Taco Bell and that, when her mother worked there, she left C.C. and her brother with a woman named "Miss Petra," who "used to be nice." C.C. recalled that, when she and her brother stayed with Miss Petra, also there were Miss Petra's two daughters and her two cousins. C.C. said that her brother came with her to Miss Petra's, and either their mother or father drove them to Miss Petra's home. Miss Petra took care of other children as well.

C.C. said that she and her brother, who was five at the time of trial, would arrive at Miss Petra's when it was "[s]unny." When they arrived "[t]he lady" would tell them to go to sleep on the couch. She and her brother would use his blanket and lay down on the couch. Sometimes the "lady" would turn on cartoons.

The prosecutor asked C.C. if anyone ever touched her inappropriately while she was at her babysitter's house. C.C. responded, "Santos" referring to the Defendant. The Defendant's attorney objected, noting that the victim was clearly in error because the Defendant did not live at the babysitter's house. The State then attempted to clarify, asking C.C. whether the Defendant had given her a "bad touch" on her privates. The prosecutor asked, "[C]an you tell us whose house you were at when [the Defendant] gave you a bad touch?" C.C. responded that she was at the house of "[h]is sister," "Maria," who was a different babysitter than Miss Petra. Maria, she said, used to be her mother's friend. C.C. said she went to Maria's house when there was no school, and Maria babysat for C.C. and

---

[1]It is the policy of this Court to refer to victims who are minors by their initials. As such, we refer to the victim in this case by her initials.

her brother. C.C. said her mother was working at the time, but she did not recall where she was working. She also said she did not remember what the house looked like, if it was made of brick or wood, or any other details about it.

C.C. testified that, when she arrived at Maria's house, Maria would tell her to get on the couch, where C.C. and her brother would lie down with blankets that they brought. C.C. said they would lie on the same couch. C.C. said that, usually present at Maria's house, were Maria's two daughters, the Defendant, and Maria's son.

C.C. said that the Defendant gave her a "bad touch" at Maria's house on more than one occasion while she was in the living room where she was sleeping with her little brother. The Defendant would come into the living room, go into the bathroom, and then come into the living room where he "w[ould] give me the bad touch." She was unsure whether she was asleep or awake on the couch. The Defendant, she recalled, was standing up, close to her head, and she was lying on her stomach on the couch.

C.C. said that, if she wore a skirt, the Defendant would touch her private over her clothes. The Defendant used his fingers to touch her. C.C. described the touch as "hard," and she said that she "smacked" the Defendant. C.C. said she told the Defendant to "stop" but "he wouldn't listen." C.C. said she could not recall if the Defendant had ever touched her under her clothes. C.C. then said that the Defendant never touched her skin, her legs, or her tummy. She said he did touch her private part. She said, "He would have his hand – he would touch me over my clothes and then he will put his hand inside my private and – and it will hurt me." She said it felt "hard."

C.C. testified that she did not recall how the Defendant's hand got to her private part, but she did recall that this happened on more than one occasion. C.C. said the Defendant never said anything when he put his hand inside her private part.

C.C. testified about one specific occasion when the Defendant touched her. She said that he was on the couch with her and that she was wearing a skirt. It was morning, and she could not recall if her brother was on the couch also. She could not recall if the Defendant had ever inappropriately touched her before. She said that it was the first time that he had done this. C.C. said that the Defendant "came out of the bathroom, he takes my blanket off and then he'll put his hand – and he'll put his hand to my private." The Defendant, she said, went up her skirt and then pushed her panties to the side.

C.C. said she never told Maria what had happened. The first person she told was her mother. She said that she told her mother because her stomach was hurting. Her mother took her to the hospital. C.C. described what happened at the hospital as follows:

7

My mom – she had a friend that she told. She – my mom told her that my stomach was hurting and then they went – we went to the hospital and then they told me that my stomach was hurting and they – that something happened to me, and then I can't remember more of it.

C.C. said that another person had also given her a "bad touch." She said that there was another lady that her mother had met that used to take care of C.C. and C.C.'s brother. She said that there was a man there who would come home from work, go into his room, come back to the living room, and then touch her private. She said he would take her hand and touch her hand to his private. C.C. said that this man touched her before the Defendant did, but she could not recall if he touched her on more than one occasion.

During cross-examination, C.C. testified that she was in third grade when these events occurred. She said no one, in school or her family, had ever discussed with her what to do if someone had touched her "wrong." C.C. testified that she was unsure of the date of the touching, and she was unsure if the date of the touching was June 2010.

C.C. recalled speaking with a case worker, who recorded their conversation. She told the case worker that "Maria's brother," the Defendant, had touched her and that he touched her "pee pee" when he carried her. She said that she told the case worker that she could not remember what part of the Defendant's hand went into her, and she said she did not recall later testifying at the preliminary hearing that it was the Defendant's "nail."

C.C. recognized a photographic identification sheet that she had viewed at the police department. She said that she recognized a man in the top middle but could not remember if he was her aunt's brother or cousin. In a second identification, she recognized a man who had a mustache in the bottom right picture.

C.C. said that she did not recall telling the case worker that the man who had touched her at Maria's house had hair all over his face. She said that she had not seen the video of herself that was recorded during that conversation. She testified that the photograph that she identified was of Doniello, a different man who lived at Maria's house.

C.C. agreed that there were a lot of people in the house, including Maria's two young daughters, her adult daughter, Doniello, and the Defendant, but she said that they were not present in the living room because they were asleep. C.C. said she did not recall telling the case worker that they were not there because they were at work. C.C. said she did not get along with Maria because "she used to be nice to my little brother and . . . sometimes she's like mean." Defense Counsel then asked C.C. if she remembered telling the case worker that it was the other babysitter who used to spank her little brother, causing C.C. not to want to

8

go to that babysitter's house. C.C. said she did recall this and that it was the other babysitter who was mean to her brother and not Maria.

C.C. then testified that it wasn't Miss Petra's brother that touched her inappropriately but that touching occurred at a different babysitter's house. She could not remember the name of that babysitter.

Defense Counsel asked C.C. about her allegation that the Defendant touched her at Maria's house. She said she was asleep at the time that she was touched. She said that the Defendant was standing beside the couch, and she smacked him on his face. C.C. could not remember if she had told her case worker about smacking the Defendant.

Defense Counsel noted to C.C. that the case worker asked her on the video if anyone had ever made her touch them and that C.C. told the case worker "no." C.C. said the first person she told that to was her mother but that, before the trial, she had never mentioned that fact to anyone else.

During re-direct examination, C.C. testified that she was asleep when the Defendant touched her the first time and that he also touched her while she was awake.

During re-cross examination, Defense Counsel noted that C.C. had testified she was asleep when the Defendant touched her the first time and also that, on that occasion, before the touching, she saw him come out of the bathroom and into the living room. C.C. said she saw the Defendant coming out of the bathroom while she was asleep.

At this point during the trial, the jury took a break. After a short break, the trial court asked Juror Nix to come into the court room. The following exchange then occurred:

> THE COURT: . . . [I]t's my understanding that you remembered something while you – we were going through the first part of this that you've told Officer Anders. And first, I want to say thank you for calling it to our attention. It's my understanding that your father has been through this process, am I correct?

> JUROR NIX: Yes. In the mid 90's he was charged and never convicted. It was with my – my niece was the victim, so I was – I've always been in the situation, I don't know what went on.

> . . . .

9

THE COURT: And you recalled that [the Prosecutor in this case] dealt with the case?

JUROR NIX: I believe so. I recognized her voice when she started speaking and then the voice and the face together. It doesn't – like I said, nothing reflects on my fairness, but I understand the appearance of –

THE COURT: Have you said anything about this to your fellow jurors?

JUROR NIX: No.

Juror Nix expressed his opinion that he could still be fair and impartial. The following day, Defense Counsel noted on the record that he had spoken with the lawyer for Juror Nix's father. That lawyer indicated that the only son present during the proceedings was hostile towards his father and that there was a subsequent civil lawsuit. Defense counsel expressed further concern that, according to the father's attorney, Juror Nix had sat through his father's two trials, a fact that Juror Nix never mentioned to the court during voir dire. Defense counsel opined that Juror Nix may have an ulterior motive for not mentioning that fact.

Defense Counsel then moved again for a mistrial, based upon the disclosure of the woman who had been abused forty-seven years before and that no one could be confident that Juror Nix, who had failed to mention he sat through two trials despite being asked as much directly, did not taint the jury.

The prosecutor confirmed that Juror Nix's father had been tried twice for child sex abuse related offenses. The first time, the result was a hung jury. The judge then recused himself, and Judge Lebowitz, the judge presiding over the Defendant's trial, heard the Rule 29 motion.

The parties then questioned the bailiff, Officer Anders, about how Juror Nix made his disclosure. Officer Anders stated that Juror Nix "just walked out of the jury room and said that there was something bothering him that he thought you should know about." Officer Anders opined that none of the other jurors heard Juror Nix because they were inside the jury room while Juror Nix had stepped outside to speak with the bailiff.

The trial court dismissed Juror Nix and then denied the motion for mistrial stating that she did not see a reason for the mistrial. She said that she was going to ask the jury and ensure that Juror Nix had not spoken with them about his father's trial.

When the jury returned, the trial court informed them that Juror Nix had been excused

for personal reasons.  The trial court then asked the jury:

> [H]ave each of you obeyed my order yesterday not to discuss this matter amongst yourselves, nor to allow anyone to discuss it with you here or anywhere else?  And if our answer to that is yes, you have obeyed my order, please raise your hand.  Has anyone attempted to discuss this matter with you? Okay.

Heidi Chan Perez, C.C.'s mother, then testified, stating that she had two children, C.C. and J.C.  Ms. Perez said that C.C. was born in 2001, and was ten at the time of the trial, and J.C. was born in 2007.  Ms. Perez recounted that she had come to America in 2002, when C.C. was six or seven months old, a year after her husband had immigrated.  In 2009, Ms. Perez was working as a housekeeper for West Town Cleaning until September of that year. She was unemployed for a time and then began working at Taco Bell in January 2010.  Ms. Perez said that her husband was employed as a carpenter, and, when they were both working during the day, they took their children to a babysitter.  Ms. Perez recalled that Ms. Funes, "Maria," was one of their babysitters, and the Defendant, who was Ms. Funes's brother, was present when she dropped off C.C. and J.C. at Ms. Funes's house.  Ms. Perez estimated that, in early 2010, C.C. and J.C. stayed with Ms. Funes approximately three days per week and also on Saturday.  Ms. Perez said that the children stopped going to Ms. Funes's house in April 2010.

Ms. Perez testified that on June 30, 2010, C.C. complained of stomach pain.  Ms. Perez thought that it was from something she had eaten, but C.C. "cried and cried" due to the stomach pain.  Concerned over C.C's response, Ms. Perez took C.C. to the doctor.

During cross-examination, Ms. Perez testified that there was a four-month period of time in 2010 during which Ms. Perez lost contact with Ms. Funes.  Ms. Perez said that, during this time, the wife of someone that she worked with at the mall watched her children.  Ms. Perez said that C.C. told her that, during this four-month period, during which they went to two different babysitters one of whom was Ms. Funes, someone other than the Defendant had also inappropriately touched her.

Ms. Perez said that her uncle had impregnated his own daughter and that, because of this, Ms. Perez started telling C.C. at a very young age that she should not allow anyone to touch her private area.  Ms. Perez said that, shortly before C.C. told her about the inappropriate touching, she and her family had watched a show about child abuse.  Ms. Perez agreed that the detective asked her if C.C. could have made up this allegation because she did not want to go to the babysitter or for attention, and Ms. Perez told the detective that she did not think that her daughter would do that.

11

Ms. Perez testified that, on the day that she took C.C. to the hospital, she told C.C. that C.C. could tell her the truth if the allegation that the Defendant had touched her was not true. She said that C.C. maintained that she had been inappropriately touched but said that she did not remember who had touched her. After Ms. Perez asked C.C. "who . . . so many times," C.C. eventually recalled the Defendant's name.

During redirect examination, Ms. Perez said that C.C. told her that the touching had occurred at "Maria's" and that it was Maria's brother who had touched her.

Dr. James Alex Eppert testified that he treated C.C. when she came to the hospital complaining of "generalized abdominal pain" and an "alleged sexual assault." Dr. Eppert said that C.C. was unable to give the doctor any specific dates or time period when the assault occurred but it was "kind of implied that it just happened fairly recently . . . ." Dr. Eppert examined C.C. from "head to toe" looking for signs of abuse. He found no bruising or lacerations to the vagina or anus. Dr. Eppert said that C.C.'s mother told him that C.C. had not been to the babysitter since the end of school, and he treated C.C. on the last day of June.

During cross-examination, Dr. Eppert explained that he got the impression from C.C. that the inappropriate touching had occurred recently. He said, however, that C.C.'s mother said that C.C. had not been to that babysitter's house in a while, so he then assumed that the assault could not have occurred that recently. The doctor said that he turned the information over to the Department of Children's Services to investigate, but he did not recall whether he informed them that C.C. had alleged that two different men had inappropriately touched her.

Dr. Eppert said that his report indicated that C.C. had told him that someone else at her current babysitter's house had also inappropriately touched her. She did not recall who that person was, other than that it was an adult male.

Shelley Clemons, an investigator with the Knoxville Police Department, testified that she responded to a call from the hospital in the early morning hours of July 1, 2010, stating that C.C. was at the hospital complaining of an alleged rape. Investigator Clemons said that she arrived at the hospital at around 12:15 a.m., after C.C. had been discharged. Investigator Clemons said that she spoke with nurses at the hospital and contacted C.C. and Ms. Perez the following day. Investigator Clemons interviewed C.C. and her mother with the aid of an interpreter. After this interview, Investigator Clemons arranged for a forensic interview of C.C., which she scheduled for July 6, 2010.

At the conclusion of the forensic interview, Investigator Clemons determined that she

needed to find Maria Funes and her brother, the Defendant. Investigator Clemons went to Ms. Funes's home the following day, July 7, 2010, and spoke with Ms. Funes. Investigator Clemons returned July 8, 2010, and spoke with the Defendant and his brother, Doniello. Investigator Clemons said that she showed C.C. a photographic lineup with six pictures, one of which was a photograph of Doniello. C.C. identified Doniello Funes as being a picture of one of Maria Funes's brothers but said that Doniello never touched her. Investigator Clemons showed C.C. a second set of photographs, and C.C. identified the Defendant's photograph as being Maria Funes's brother and as the man who had inappropriately touched her. The State played an audio recording of C.C.'s photographic identification. Investigator Clemons said that she arrested the Defendant later that day.

During cross-examination, Investigator Clemons said that she was present when C.C. was interviewed on multiple occasions. She said that she was aware that C.C. alleged that two different men, both of whom were brothers of her different babysitters, had inappropriately touched her.

The Defendant then played the audio recording of C.C.'s interview with the investigator. During that interview, she said that the Defendant touched her on her "pee pee" one time. C.C. told the detective that no one had ever made her touch them. During a portion of the recording when C.C. was speaking with the interpreter, the interpreter asked C.C. if she was afraid. C.C. responded "I am afraid to have[e] to tell another person about this." Investigator Clemons said that until the trial she had never heard C.C. state that someone had made her touch them.

Investigator Clemons agreed that there was no physical evidence that a crime had been committed and that her investigation was based solely on C.C.'s complaint. The investigator said that she met with Maria Funes, the Defendant's sister, on July 7, 2010, to ask her about her babysitting history. Investigator Clemons said that she created a report.

Investigator Clemons identified her report and said that it indicated that she spoke with Maria Funes on July 7. Ms. Funes informed the investigator about her babysitting history and who lived in the house. On July 23, Investigator Clemons had Ms. Funes bring Ms. Funes's children to Child Help to be interviewed. After this, Ms. Funes refused to speak with the investigator.

Investigator Clemons agreed that C.C.'s two allegations of sexual abuse had some similarity in that they both involved a babysitter's brother, who she alleged both touched her but without other sexual activity, and that the touching in both cases occurred on the couch in the living room. Investigator Clemons said she was aware that C.C.'s mother had discussed with C.C. not to let anyone touch her inappropriately.

13

The Defendant called Maria Funes, the Defendant's sister, who testified that in 2009 she lived with her three children, her brothers, and her sister. Ms. Funes said her brothers, Doniello and the Defendant, worked as roofers. The Defendant did not drive, so Doniello drove them both to work. Funes said that she started taking care of C.C. and J.C. in 2009. She watched them one day per week, when they were not in school, and she charged Ms. Perez, C.C.'s mother, $15.00 per hour to watch the children, $10.00 for J.C. and $5.00 for C.C. Ms. Funes said that Ms. Perez did not want to pay this amount. Ms. Funes recalled that her own daughters, aged seven and eight, about the same age as C.C., were present when Ms. Funes babysat for C.C. and J.C. Ms. Funes testified that her daughters and C.C. got along well and played outside most of the time.

Ms. Funes said that the Defendant never worked alone. She said that there was no time that the Defendant was at the house and Doniello was working. On Saturdays, she did not take care of the children. Further, she said she did not sleep while the children were at her home. Her daughters, who were in school, also did not sleep on the days that she kept C.C. and J.C.

Ms. Funes testified that, at some point, Ms. Perez lost her job at the mall. Ms. Funes said she did not keep the children after that time. Ms. Funes said that Ms. Perez became employed at Taco Bell in February 2010, and she kept Ms. Perez's son occasionally until April 2010, when Ms. Funes informed Ms. Perez that she could no longer keep the children.

Ms. Funes said that she got along with C.C. "[f]ine" and that C.C. never told her that the Defendant had touched her inappropriately.

During cross-examination, Ms. Funes testified that, if one entered her house from the driveway, they would walk into the kitchen. From the kitchen, it opened to the dining room and then to the living room. The home had three bedrooms. She and her daughters slept in one bedroom, her son slept in another bedroom, and the Defendant and Doniello shared the third bedroom.

Ms. Funes agreed that during the summer of 2009 her children were not in school. She kept C.C. and J.C. approximately three days per week. She agreed that Doniello and the Defendant did not work on days when it was raining heavily. She said that they often played soccer on those days in the rain. She said that, however, Ms. Perez did not bring the children to her home on those days because the children's father also did not work when it was raining and he would keep the children on those days. Ms. Funes testified that the Defendant was never at the house when C.C. was there.

Based upon this evidence, the jury convicted the Defendant of one count of rape of

14

a child, based upon the State's election that the Defendant placed his finger inside of C.C.'s vaginal opening while she was lying on the couch, and one count of aggravated sexual battery, based upon the State's election that the Defendant touched her "private over her clothes with his fingers."

## C. Sentencing

At the Defendant's sentencing hearing, Defense Counsel expressed concern that the Defendant was mentally "slow," which he asserted had caused some issues during pretrial and trial proceedings. He requested a continuance so the Defendant could be evaluated. The trial court denied this request.

C.C.'s mother, Ms. Perez, testified and asked that the Defendant be given the maximum sentence. Ms. Perez said that there was no reason for the Defendant to have touched her daughter.

The State and the Defendant offered no further proof, and the trial court sentenced the Defendant as follows:

[The Defendant] is convicted of rape of a child in Count One and aggravated sexual battery in Count Two after trial by jury. The Court . . . need[s] to add something to the [13th juror ruling] . . .

I'm still affirming my ruling as 13th juror, but when . . . [C.C.] reported this offense to her mother, her mother discouraged her saying that . . . that she should not make any kind of accusation that might be false because it is not something anyone would want to do. And her mother was right to do that at the time because it is a terrible thing to put a child through all this as well as a parent if it is not true. Nevertheless, [C.C.] persisted, and her mother and her father believed her and brought it to the attention of the authorities. That lent some credibility also to the Court with respect to the testimony of [C.C.], and that was a part of the ruling that I failed to state and wish to state at this time.

[The Defendant] is facing 25 years at one hundred percent (100%) in Count One. That . . . will be the sentence. And he will be required to do community [supervision] for life and register should he ever be released inside the United States or be in the United States.

As to Count Two which is really the disputed count, the proof demonstrated that . . . at least the State relied on two specific instances.

15

[Defense Counsel] is right to point out that there was a lot of question as to the time frames, to the number of actions, but the State has relied on these two times, the first time, of course, the subject of Count One, but the second time was a touching other than what was alleged to have occurred in Count One.

It is true that number seven as an enhancement factor is not useable; the Court will not consider it. Whether or not [C.C.] was especially vulnerable due to age, the Court feels that she was vulnerable due to her age, at that time seven years old or eight years old, and with very little schooling and very little understanding of how to fend for herself. However, because of that, I think that is the only enhanc[ment] factor that can be used.

There is one mitigating factor the Court finds, and that is that to our knowledge, this is [the Defendant's] first offense and has never committed any other offense at least in the United States that we're aware of . . . .

[The Defendant] has come into this Court and faced these charges, and I agree that it is appropriate because of the enhanc[ement] factor that I have found, her vulnerability, to sentence [the Defendant] to ten years in Count Two.

However, having used that factor, that will be a concurrent sentence. This was ongoing, I understand that it was ongoing . . . but, there are some issues that concern the Court about when continuing conduct – and I think that this sentence which will therefore be a 25-year, 100-percent effective sentence as to these two counts is the appropriate sentence in this case. That does not mitigate against anything that Ms. Perez has said to me today. She's absolutely correct, this has devastating effects on her, her family and everyone else.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it did not grant a mistrial or dismiss the jury after several members of the venire discussed having been victims of child sexual abuse; (2) the court erred when it denied defense counsel the opportunity to question the investigator about her comments about the weakness of the case; and (3) the evidence is insufficient to sustain his convictions.

16

## A. Mistrial

The Defendant contends that the trial court erred when it failed to grant a mistrial or dismiss the jury after several members of the venire discussed having been victims of child sexual abuse. The Defendant avers that the situation was further compounded by the fact that Juror Nix failed to disclose that his father was charged but never convicted of sexual abuse. The State responds that the trial court properly denied the Defendant's motion for mistrial because there was no manifest necessity for such action.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Both the Sixth Amendment to the United States Constatation and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. The jury selection process must be guarded carefully to ensure that the defendant has a fair trial and that the verdict is reached by an impartial trier of fact. *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). The Tennessee Constitution guarantees every defendant "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" *Id.* at 354 (quoting *Toombs v. State*, 270 S.W.2d 649, 650 (Tenn. 1954). Voir dire is very important, and its integrity must be zealously guarded. *Id.*(citing numerous Tennessee opinions from each of our appellate courts expressing this principle). "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the under pinnings of our justice system." *Id.* at 354. "The perception of a fair trial is just as important as the reality." *State v. Tate*, 925 S.W.2d 548, 557 (Tenn. Crim. App. 1995) (holding that the only means of preserving the public confidence in the conduct of the trial therein was to require the appointment of an entirely new prosecution team).

### 1. Ms. Watkins

This case presents a set of facts unique and not previously addressed by a court of this State. The State asked the venire about whether a child victim's delay in disclosing abuse would "cloud her testimony" in their eyes. Ms. Watkins disclosed, tearfully, that she had been abused by a neighbor and had "never revealed it to anybody to this day. I never told my parents, I've never told my husband, I've never told anybody until this day." The State questioned her further about the abuse, which occurred more than thirty years earlier, and Ms. Watkins again said, "I've never – I've never admitted it to this day." The record indicates that other potential jurors from the venire handed her Kleenex and expressed sympathy. The trial court offered no instructions to the jury about how to handle or interpret this information.

The empaneled jury then heard the Defendant's case, which involved the testimony of C.C., who did not disclose the alleged abuse for some period of time after the abuse occurred. The actual period of time is uncertain, in part because the victim was uncertain when the alleged abuse occurred. C.C.'s credibility was of extreme importance to the State's case and was the only evidence the State had to prove its case against the Defendant. The delay in C.C.'s disclosure is one area the Defendant could use to attack her credibility. His ability to cross-examine her on this issue, however, was undermined by the fact that the jury had just witnessed a credible member of the jury pool confess that she had been abused more than thirty years before the trial and had never disclosed the abuse to anyone, including her husband or parents. We conclude that, under these circumstances, when a juror's has disclosed information during voir dire questioning that directly lent credibility to the testimony of the victim, the jury's impartiality was compromised. The jury expressed sympathy in the form of offering reassuring words and handing her Kleenex to the victim of sexual abuse in the jury venire, a victim who did not disclose her abuse for a lengthy period of time, and then it immediately thereafter heard a case involving the veracity of the allegations of a victim of sexual assault who had not immediately disclosed the abuse.

As previously stated, "[t]he perception of a fair trial is just as important as the reality." *See Tate*, 925 S.W.2d at 557. We conclude that, given the circumstances described above, there was not the perception of a fair trial. The trial court should have declared a mistrial because apparently an impartial verdict could not be reached by a jury that had been subjected to Ms. Watkins's disclosure had not been given instructions about how to assimilate her disclosure of abuse. Accordingly, we conclude that the trial court abused its discretion in this regard. We reverse the Defendant's conviction, and we remand the case for a new trial. In the interest of justice, and in the event of further review, we will address the other issues presented by the Defendant.

### 2.  Juror Nix

The Defendant next asserts that the jury was further tainted by Juror Nix's failure to disclose his father's trial for similar offenses. Voir dire allows for the empaneling of a fair and impartial jury through questions that permit counsel to intelligently exercise challenges. *State v. Akins*, 867 S.W.2d 350, 355-56 (Tenn. Crim. App. 1993). Full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges. *Id.* at 356. Jurors, therefore, are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." *Id.*

The defendant must establish a prima facie case of bias or partiality. *Id.* "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.* Silence by a juror when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. *Id.* "Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." *Id*. at 356 (footnotes omitted). "The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances." *Id*. at n.13. The juror's intent is not dispositive of the issue of bias. *Id*. at n.15.

A presumption of bias arises "when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias." *Id.* at 357. The presumption may be rebutted by an absence of "actual prejudice" or "actual partiality." *Id.* In determining whether the presumption is overcome, however, the court must view the totality of the circumstances and not merely the juror's self-serving claim of lack of partiality. *Id.* Actual prejudice has been established when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations giving rise to the possibility that improper extraneous information was provided to the jury. *Id.*

We conclude that Juror Nix's failure to disclose that his father was tried for sexually abusing his niece was not insignificant. The Tennessee Supreme Court has recognized that "potential bias arises if a juror has been involved in a crime or incident similar to the one on trial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011). Although Juror Nix was not directly involved in the crime, he was, according to his father's attorney, present for the duration of the trial and "hostile" toward his father. Juror Nix failed to disclose that his father had not one, but two, trials for this offense, that he was present for the duration of the trial, and that his father was not convicted. Other evidence was presented that showed that his father may have been in fact been found guilty and that there was a civil trial with regard to the abuse. Because of Juror Nix's failure to disclose this information, a presumption of

bias arises.

The presumption of bias may be overcome, though, by an absence of "actual prejudice" or actual partiality. *Akins*, 867 S.W.2d 357. As our Supreme Court explained:

> While that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome. Moreover, when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations which gives rise to the possibility that improper extraneous information was provided to the jury, actual prejudice has been demonstrated.

*Id.*

In this case, Juror Nix did not deliberate with the rest of the jury because he was dismissed during the trial. Juror Nix stated that he did not discuss his father's case with any of the other jurors. Accordingly, we conclude that the presumption of bias is overcome by the absence of "actual bias." The Defendant is not entitled to relief on the basis of this issue.

### B. Cross-Examination of Investigator Clemons

The Defendant contends that the trial court erred when it prevented him from cross-examining Investigator Clemons about her comments about the weakness of the case, made after interviewing C.C. and C.C.'s mother. The State counters that the trial court properly limited the Defendant's cross-examination of Investigator Clemons as his proposed question was not relevant, and it invaded the province of the jury.

> Cross-examination is a fundamental right afforded by the Confrontation Clause of the Sixth Amendment. A component part of this constitutional protection is the right to establish or to establish bias otherwise impeach the credibility of a witness. The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court. The trial court abuses its discretion by unreasonably restricting a defendant's right to cross-examine a witness against him.

*State v. Echols*, 382 S.W.3d 266, 284-85 (Tenn. 2012) (internal citation omitted). "[A] defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State*

*v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (citing *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)).

In this case, we agree with the State that the trial court did not abuse its discretion when it prevented the Defendant from questioning Investigator Clemons about statements she made relative to the strength of the case, which she made during the course of her investigation. Investigator Clemons's opinion may have changed based on other evidence gleaned during the course of her investigation, and the jury is ultimately charged with determining the strength of the State's case. Accordingly, the trial court did not err when it denied the Defendant's request to question the investigator about these statements. He is not entitled to relief on this issue.

## C. Sufficiency of Evidence

The Defendant finally contends that the contradictions in the testimony of the victim and her mother prove that there was reasonable doubt about whether the Defendant was the man who touched her. The State counters that sufficient evidence was presented for a rational trier of fact to find the Defendant guilty of rape of a child and aggravated sexual battery beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or

21

reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

The State elected facts to prosecute the Defendant for rape of a child based upon the victim's testimony that the Defendant put his hand inside her private part. Viewing the evidence in the light most favorable to the State, we conclude that the evidence presented is

sufficient to sustain the Defendant's conviction for rape of a child. The victim recalled an incident where she was at "Maria's" house wearing a skirt and panties and lying underneath a blanket on the couch with her brother. The Defendant entered the room, said nothing, touched the victim over her clothes and then "put his hand inside [her] private." The victim recalled that it "hurt" when the Defendant touched her in this manner. Our Supreme Court has concluded that the testimony of a child victim, alone, is sufficient to sustain a conviction for child rape. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003). Furthermore, the jury is the primary instrument of justice to determine the weight and credibility to be given to the testimony of the witnesses. *Cabbage*, 571 S.W.2d at 835. A jury verdict, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In this case, the victim, who was older than three but younger than thirteen, testified that the Defendant sexually penetrated her by placing his hand inside her private, which hurt. This testimony meets the elements of rape of a child, and it supports the Defendant's conviction for rape of a child.

The jury also convicted the Defendant of aggravated sexual battery. "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" T.C.A § 39-13-501(6). The State elected facts to prosecute the Defendant for aggravated sexual battery based upon the victim's testimony that the Defendant touched her "private" over her clothes, and she smacked him and told him to stop. Again, the victim's testimony alone is sufficient to support the Defendant's conviction as long as her testimony supports the elements of the offense. Here, the victim testified that she was lying on the couch when the Defendant, who was standing beside the couch, began touching her front private area. The victim said the Defendant touched her over her clothes, and she "smacked" him and told him to stop. He would not, however, listen. This evidence supports the Defendant's conviction. It is undisputed that the victim was less than thirteen, thus, the relevant inquiry is whether the evidence sufficiently supports the jury's finding that the touching could be reasonably construed as being for the purpose of sexual arousal or gratification.

The phrase "for purposes of sexual arousal or gratification" simply defines the nature and purpose of the "sexual contact." *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *9 (Tenn. Crim. App., at Jackson, Feb. 7, 2013), *no Tenn. R. App. P. 11 application filed*. The requirement of a particular purpose, to arouse or gratify sexual desire, distinguishes the crime of sexual battery from an ordinary assault and from non-criminal touching or contact. *See State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-

CD, 2005 WL 623244, at *5 (Tenn. Crim. App., at Knoxville, Mar. 17, 2005) (citing MODEL PENAL CODE § 213.4 (1980)), *Tenn. R. App. P. 11 application denied* (Tenn. Oct. 10, 2005).

> This Court has previously examined the statute defining "sexual contact" and concluded "there is no requirement that the sexual contact itself be for sexual arousal or gratification." *State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App., at Nashville, June 3, 2004), *no Tenn. R. App. P. 11 application filed*. The Court went on to state that the statute also does not require that the appellant become sexually aroused or gratified by the sexual contact. *Id*. The statute merely requires touching that can be "reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. (citing T.C.A. § 39-13-501(6) (2010)); *State v. Steven Webster*, No. W1999-00293-CCA-R3-CD, 1999 WL 1097820, at * 1-2 (Tenn. Crim. App., at Jackson, Nov. 22, 1999), *perm. app. denied* (Tenn. 2000)).

*Johnson*, 2013 WL 501779, at *9.

From the circumstances surrounding the Defendant's touching of the victim, a rational jury could reasonably construe his touching as being for sexual arousal or gratification. The Defendant touched the victim's private area over her clothes in a "hard" manner. She told him to stop, even smacking him, but the Defendant would not listen. A rational jury could have determined based upon the victim's testimony that the touching was for sexual arousal or gratification. Further, it rests within the jury's province to resolve any and all conflicts in testimony. In this case, those conflicts were resolved in favor of the State. We will not disturb the jury's determination on appeal.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we reverse the trial court's judgments. We remand this case for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE